08 CV 10104

Victoria A. Cundiff
Danielle M. White
PAUL, HASTINGS, JANOFSKY & WALKER LLP
75 East 55th Street
New York, NY 10022
Tel.: (212) 318-6000
Fax: (212) 319-4090

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



---

DUFF & PHELPS ACQUISITIONS, LLC,

                           Plaintiff,

           - against -

PETER R. CORBELL,

                          Defendant.

Civil Action No. _____

---

## VERIFIED COMPLAINT

Duff & Phelps Acquisitions, LLC (together with its subsidiaries, "**Duff & Phelps**"), by and through its attorneys, Paul, Hastings, Janofsky & Walker LLP, as and for its Complaint against defendant Peter R. Corbell ("**Defendant**" or "**Corbell**"), alleges as follows:

## NATURE OF THE ACTION

1.      Duff & Phelps asks this Court to hold Corbell to his promise not to compete. In October of 2006, Corbell, a senior executive of Chanin Capital Partners, LLC ("**Chanin**") sold his entire interest in Chanin to Duff & Phelps. His agreement to sell that interest, and not to compete with the business that was sold, were conditions precedent to Duff & Phelps' acquisition of Chanin. Duff & Phelps paid Corbell substantial cash and provided stock and

ongoing payments for his interest in Chanin and his agreement not to compete. Nevertheless, and despite his contractual commitments, Corbell resigned yesterday without notice and advised Duff & Phelps that he was joining a key competitor. He will be performing precisely the same services he had promised not to perform and that he agreed would irreparably harm Duff & Phelps if he did. Accordingly, Plaintiff seeks temporary, preliminary and permanent injunctive relief to enjoin Corbell from competing through November 19, 2009 as set forth in more detail below.

## PARTIES

2.      Duff & Phelps is a Delaware limited liability company with a principal place of business at 55 East 52nd Street, 31st Floor, New York, NY 10055.

3.      Upon information and belief, Defendant Peter R. Corbell is an individual who resides at 1849 Valley Park Avenue, Hermosa Beach, California 90254.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of costs and interests, and there is complete diversity of citizenship between the parties.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Duff & Phelps' headquarters and principal place of business are situated in this district and the parties agreed in the Noncompetition, Nonsolicitation and Confidentiality Agreement ("**Agreement**")[1]

---

[1] A true and correct copy of the Agreement is attached hereto as Ex. A.

to submit to the jurisdiction and venue of the federal and state courts of New York for the resolution of all disputes arising under, or relating to, the Agreement. Corbell maintained extensive, ongoing contact with senior management and clients in New York through the course of his work for Chanin and Duff & Phelps.

## BACKGROUND AND FACTS

**Duff & Phelps' Business and Acquisition of Chanin**

6.      Duff & Phelps is a business consulting firm and investment bank that offers its clients guidance in sophisticated financial arrangements including mergers and acquisitions, valuation analyses, fairness opinions and, of critical importance in today's troubled financial environments, financial restructuring, both in and out of bankruptcy.

7.      In 2006, Duff & Phelps explored ways to expand its existing restructuring business. It conducted an extensive search and identified Chanin as a national leader in the field. Chanin, which had offices in New York and California, had long focused on representing creditors, debtors and other stakeholders in bankruptcy actions nationwide and on finding and developing opportunities for restructuring distressed companies. For many years Chanin's restructuring group has advised hundreds of clients across all industries, consummating transactions valued over $213 billion. Chanin's areas of expertise includes financial consulting on mergers and acquisitions, restructuring, valuations, fairness and solvency opinions, corporate finance and capital raising services. Chanin represents parties in restructuring transactions, including Bankruptcy Code 363 sales as well as debtor-in- possession financings and exit financings. Through this work, Chanin developed a national reputation; an extensive national

network of clients, referral relationships (including law firms, hedge funds, private equity funds, investment advisors, diversified companies, and accounting firms); confidential information about client needs and strategies for serving them; and as a result, developed substantial goodwill in the restructuring field.

8.    Duff & Phelps decided to purchase Chanin to acquire those business relationships, confidential information and goodwill.  In order to complete the purchase and acquire the goodwill, Duff & Phelps acquired the entire interest of each of the direct and indirect owners of the business, including defendant Peter Corbell.

9.    Prior to Duff & Phelps' acquisition, Corbell had worked for Chanin for over 5 years and was one of only a few senior Chanin Managing Directors who devoted his practice primarily to the area of financial restructuring.  During his employment with Chanin and through his involvement as a direct and indirect owner of Chanin and its predecessors, Corbell developed business relationships, goodwill, and confidential information that Duff & Phelps acquired through its purchase of Chanin.  These core business relationships include Chanin's relationships with its clients and its referral base.

10.    As a condition precedent to the closing of Duff & Phelps' purchase of Chanin, Corbell agreed to sell, and Duff & Phelps agreed to buy, all of Corbell's SAR Stock in Chanin. Duff & Phelps paid him an aggregate value of over $ 700,000 in consideration for the purchase of Corbell's interest in Chanin and his agreement not to compete.  That compensation included the sale price allocation and a transaction earn-out payment for 2007.  Duff & Phelps also granted certain equity rights to Corbell.

**The Agreement**

11.     On or about October 31, 2006, in connection with the sale of Corbell's interest in Chanin to Duff & Phelps, Corbell entered into the Agreement with Duff & Phelps as a Selling SAR Holder.

12.     Pursuant to the Agreement, Corbell agreed that he would not "participate in, or render services for . . . any Competing Business" in, among other areas, "restructuring consulting or advisory services" for a specified period not to exceed five years.  Under the circumstances at bar, the contractual restraint is through November 19, 2009.  Ex. A, ¶ 2(a) & 2(b)(ii).

13.     Corbell also agreed that he would not directly or indirectly:

> (i) solicit, induce or attempt to induce any employee or independent contractor known by [Corbell] to be employed at the time by [Chanin or its predecessors] to leave the employ or contracting relationship with such entity (other than by means of general solicitations not directed at such persons) or (ii) solicit, induce or attempt to induce any employee known by [Corbell] to be employed at the time by [Chanin or its predecessors] to remain in or return to the employ of [Corbell] or any of his Affiliates or otherwise attempt to retain or obtain the services of any such person (other than by means of general solicitations not directed at such persons), or (iii) solicit, induce or attempt to induce any customer or other business relation of [Chanin or its predecessors] as of the date hereof to cease doing business with such entity.

Ex. A, ¶ 2(c).

14.     Corbell also agreed that he would not disclose any confidential information concerning Chanin or its predecessors to any unauthorized third person and that he would take "all appropriate steps to safeguard Confidential Information and to protect it against disclosure,

misuse, espionage, loss and theft." Ex. A, ¶ 1.  Corbell is obligated to return all Confidential

Information in any format to Duff & Phelps within two days after his final day of employment

with Duff & Phelps.

15.     Corbell further agreed that "irreparable harm would occur in the event that any of

the agreements and provisions of this agreement were not performed fully by [Corbell] in

accordance with their specific terms or conditions". Ex. A, ¶ 3.

**Chanin's Post-Acquisition Employment**

16.     Through November 19, 2008, Corbell was employed by a Duff & Phelps affiliate

and continued to maintain and develop the business, relationships and confidential information

that are the lifeblood of the Chanin business that Duff & Phelps had acquired.  As one of only a

few Managing Directors focused exclusively on restructuring and distressed companies, Corbell

has been responsible for sourcing and executing client deals.  Thus, Corbell has continued to

participate in business presentations, to meet with and cultivate the long-standing referral sources

and goodwill purchased by Duff & Phelps, and has continued to develop and learn the

confidential business plans both of Duff & Phelps' restructuring business and the needs of the

clients and referral sources.

17.     Both before and after the sale of Chanin to Duff & Phelps, Corbell was the face of

the company to many of Duff & Phelps client contacts and played an important role in

developing and maintaining the goodwill that Duff & Phelps purchased.  Importantly, Corbell

has continued his vital role as chief liaison with the hedge fund and private equity clients that

are, in the current economic client, among the businesses most in need of advice on potential restructuring arrangements because of overwhelming credit concerns.

18.     Corbell has continued to receive and generate confidential information not to be shared outside Duff & Phelps about the restructuring business.  Corbell continued to receive detailed weekly, highly confidential reports detailing leads and projects in the pipeline.  Indeed, on November 18 – the night before he resigned – Corbell attended one of the many business strategy meetings to which he was privy during his work with Duff & Phelps to review the year's activities and future plans.  Thus, as recently as yesterday, Corbell has been privy to the entire pipeline of opportunities and potential clients and referral sources of Chanin's business acquired by Duff & Phelps and in cultivating and maintaining Chanin's goodwill.

19.     On November 19, 2008, Corbell resigned abruptly without notice.  He said he was resigning to join Moelis & Company ("**Moelis**"), another financial consulting firm and key competitor which is in the process of rapidly expanding its already competitive restructuring business.  At Moelis, Corbell will be engaging in the same business as the business he sold to Duff & Phelps but now he will be competing with that business.  As he exited Duff & Phelps, Corbell acknowledged that he signed the Agreement, but said that he does not intend to honor its terms.

20.     Duff & Phelps will be irreparably harmed if Corbell is not enjoined from breaching the contract he entered into to protect the goodwill Duff & Phelps acquired in the acquisition.  The business and referral relationships Duff & Phelps acquired through its purchase of Chanin are active participants in trying to work through the current financial crisis.  They need

Duff & Phelps' services.  Corbell agreed not to compete with the business that was sold and not to interfere with the business and those relationships.  He also agreed to protect the confidential information of the business.  Duff & Phelps' ability to secure and serve those client opportunities at this critical time in the restructuring business will be severely compromised if Corbell is permitted to join Moelis and compete against the very business that he sold to Duff & Phelps and otherwise violate his Agreement.

## COUNT I
### Breach of Contract

21.     Duff & Phelps repeats and realleges the allegations contained in paragraphs 1 – 20 as if fully set forth herein.

22.     The Agreement is a valid, enforceable agreement that imposes certain contractual obligations upon Corbell.

23.     Duff & Phelps has honored its obligations under the Agreement.

24.     Corbell intends to and will breach the terms of the Agreement by, among other things, accepting employment with Moelis and competing in the financial restructuring business.

25.     The conduct of Corbell will cause, unless enjoined, substantial, immediate and irreparable injury to Duff & Phelps in an amount that cannot presently be determined and/or cannot be fully quantified.

26.     Duff & Phelps has no adequate remedy at law to redress Corbell's ongoing breach of his obligations to Duff & Phelps under the Agreement.

-8-

## Demand For Relief

WHEREFORE, Plaintiff respectfully prays for judgment to be entered against Defendant as follows:

a.      Temporarily, preliminarily and permanently enjoining Defendant and through November 19, 2009 from:

(1) breaching the terms of the Agreement and from accepting employment with Moelis;

(2) directly or indirectly participating in or rendering restructuring consulting or advisory services in the United States through November 19, 2009;

(3) soliciting, inducing or attempting to induce any employee or independent contractor known by Corbell to be employed by Chanin or its predecessors to leave Chanin's employ or to obtain the services of such any person to work with him or on his behalf (other than by means of general solicitations not directed at such persons) through November 19, 2009;

(5) soliciting, inducing or attempting to induce any customer or other business relation of Chanin or its predecessors as of the October 31, 2006 to cease doing business with such entity through November 19, 2009; and

(6) using or disclosing Chanin's Confidential Information;

b.      Awarding Plaintiff the costs of this action and its reasonable attorneys' fees pursuant incurred as a result of this action; and

c.      Awarding such other and further relief as the Court deems just and proper.

Dated: November 20, 2008
New York, New York

Respectfully submitted,

PAUL, HASTINGS, JANOFSKY
   & WALKER LLP

By: _____

    Victoria A. Cundiff
    Danielle M. White
75 East 55th Street
New York, NY 10022
Tel.: (212) 318-6000
Fax: (212) 319-4090

*Attorneys for Plaintiff*

## VERIFICATION

STATE OF NEW YORK        )
                         )  SS.:
COUNTY OF NEW YORK       )

    Brett Marschke, being duly sworn, states that he is the Executive Vice President and

Chief Operating Officer for plaintiff in this action and that the foregoing complaint is true to his

own knowledge except as to the matters in paragraph 19, which he believes to be true based on

his discussions with other Duff & Phelps employees.

_____
Brett Marschke

Sworn to me this
20th day of November, 2008

_____
Notary Public

CHRISTOPHER MATTESON
ATTORNEY & COUNSELOR AT LAW-STATE OF NEW YORK
No. 02MA6125298
Qualified in New York County
Commission Expires April 11, 2009

-11-

# Exhibit A

## NONCOMPETITION, NONSOLICITATION AND CONFIDENTIALITY AGREEMENT

This NONCOMPETITION, NONSOLICITATION AND CONFIDENTIALITY
AGREEMENT (this "Agreement"), made as of the 31st day of October, 2006 by and between
DUFF & PHELPS ACQUISITIONS, LLC a Delaware limited liability company ("Acquiror")
and Peter R. Corbell ("Selling SAR Holder").

## RECITALS

WHEREAS, Selling SAR Holder holds SAR Stock (as defined in that certain Chanin
Capital Partners Stock Appreciation Rights Plan, effective as of January 1, 2001 (the "SAR
Plan")) of Chanin Capital Partners, LLC, a Delaware limited liability company (collectively with
its subsidiaries, the "Company") and therefore has knowledge of and experience in the
Company's business, including the Company's (i) customers and vendors (including customer
and vendor lists), (ii) products and services and related costs and pricing structures, (iii)
accounting and business methods and practices and (iv) similar and related confidential
information and trade secrets; and

WHEREAS, on the date hereof, Acquiror is acquiring the Company for the consideration
and upon the terms and conditions set forth in the Unit Purchase Agreement, dated as of October
10, 2006, by and among the Company, Acquiror, Jeffrey Chanin and Company, Inc., as the
Seller Representative, and the other parties named therein (the "Unit Purchase Agreement"), and
Selling SAR Holder will receive good and valuable consideration from Acquiror for entering
into that certain Joinder, dated as of the date hereof, by and among Acquiror, the Company and
Selling SAR Holder (the "Joinder") and the cancellation by Selling SAR Holder of all rights and
obligations with respect to the SAR Stock held by Selling SAR Holder and the release of all
claims against the Company with respect thereto, in each case as set forth in the Joinder; and

WHEREAS, Acquiror desires to protect the Company's goodwill and its other
confidential business information; and

WHEREAS, the execution and delivery of this Agreement is a condition precedent to the
obligation of Acquiror to consummate the transactions contemplated by the Unit Purchase
Agreement.

NOW THEREFORE, in consideration of the foregoing, the agreements set forth below,
Acquiror's consummation of the transactions contemplated by the Unit Purchase Agreement and
for other valuable consideration (the receipt of which Selling SAR Holder hereby
acknowledges), Selling SAR Holder, intending to be legally bound hereby, agrees with Acquiror
as follows.  Any term used but not defined herein shall have the meaning ascribed to such term
in the Unit Purchase Agreement.

1.     Confidential Information.  Selling SAR Holder acknowledges that the information,
observations and data that have been or may be obtained by Selling SAR Holder during
his employment relationship with, and through his involvement as a direct and indirect
owner of, the Company or any predecessor thereof (collectively, the "Related
Companies"), prior to the date of this Agreement concerning the business or affairs
engaged in by the Related Companies (collectively, "Confidential Information") are the

property of the Related Companies, and from and after the date hereof will be the property of Acquiror.  Therefore, Selling SAR Holder agrees that he will not disclose to any unauthorized Person or use for his account or any other Person (other than Acquiror, in his capacity as an employee thereof) any Confidential Information without the prior written consent of Acquiror (by the action of the Management Committee), unless and to the extent that such Confidential Information has become generally known to and available for use by the public other than as a result of Selling SAR Holder's improper acts or omissions to act, or to the extent such disclosure is required by law.  Selling SAR Holder will deliver or cause to be delivered to Acquiror at, or within two days after, the final day of his employment by Acquiror, or at any other time Acquiror or any of its Subsidiaries may request, all memoranda, notes, plans, records, reports, computer tapes and software and other documents and data (and copies thereof) containing or relating to Confidential Information or the business of Acquiror or any of its Subsidiaries which Selling SAR Holder may then possess or have under his control.  Selling SAR Holder shall take all appropriate steps to safeguard Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft.

2.  <u>Noncompetition and Nonsolicitation</u>.  Selling SAR Holder acknowledges that he will receive good and valuable consideration from Acquiror for entering into the Joinder and the cancellation of all rights and obligations with respect to the SAR Stock held by Selling SAR Holder and the release of all claims against the Company with respect thereto pursuant to the Joinder, and that Acquiror would not have provided such consideration to Selling SAR Holder if Selling SAR Holder did not agree to enter into this <u>Section 2</u> in its entirety.  Therefore, Selling SAR Holder agrees that, to the fullest extent lawful:

(a)  From the date hereof until the earlier of (A) the fifth anniversary of the date hereof and (B) the later of (i) the third (3rd) anniversary of the date hereof and (ii) if Selling SAR Holder is terminated by Acquiror or any of its Affiliates or Selling SAR Holder resigns, the first (1st) anniversary of the date of such termination or resignation (the "<u>Term</u>"), Selling SAR Holder will not singly, jointly or as a partner, member or stockholder, directly, indirectly or beneficially own, manage, operate, control, participate in, or render services for (as a consultant or advisor), or provide financial assistance to or be engaged in any manner with the operation of any Competing Business (as defined in <u>Section 2(b)</u> herein); <u>provided</u> that if Selling SAR Holder is terminated by Acquiror or any of its Affiliates without Cause (as defined in <u>Section 2(b)</u> herein) or Selling SAR Holder resigns with Good Reason (as defined in <u>Section 2(b)</u> herein), Selling SAR Holder's obligations under this <u>Section 2(a)</u> shall terminate on the date of such termination without Cause or resignation with Good Reason, unless, upon such date, Selling SAR Holder provides Acquiror with written notice (the "<u>Notice of Extension</u>") that Selling SAR Holder elects to be bound by the provisions of this <u>Section 2(a)</u> until the first (1st) anniversary of the date of such termination without Cause or resignation with Good Reason (the "<u>Extended Term</u>"), in which case (x) Selling SAR Holder's obligations under this <u>Section 2(a)</u> shall extend until the termination of the Extended Term and (y) one-hundred percent (100%) of the

2

Class G Units (as defined in the Unit Grant Agreement) granted to Selling SAR Holder pursuant to the Unit Grant Agreement, dated as of the date hereof, by and between Selling SAR Holder and Acquiror, shall immediately vest pursuant to Section 4.3 of such agreement. Nothing in this Section 2(a) will prohibit Selling SAR Holder from being a passive owner of less than 9.9% of the outstanding stock of any publicly traded company which conducts a Competing Business so long as Selling SAR Holder has no direct or indirect participation in the business of such company;

(b)     As used in this Agreement, the term:

(i)     "Cause" means (A) willful or reckless misconduct in the execution of Selling SAR Holder's employment duties, the purpose or effect of which materially and adversely affects Duff & Phelps Management Co., LLC, a Delaware limited liability company ("D&P Management") and/or its Subsidiaries and Affiliates, and a failure to remedy such misconduct within thirty (30) days following receipt of written notice from D&P Management stating that the particular conduct or breach is unsatisfactory to D&P Management and a basis for termination for Cause; (B) a material breach by Selling SAR Holder of a material obligation under (x) any employment agreement or (y) a material written employment policy of D&P Management and/or its Subsidiaries and Affiliates and, in each case, a failure to remedy such breach within thirty (30) days following receipt of written notice from D&P Management stating that the particular conduct or breach is unsatisfactory to D&P Management and a basis for termination for Cause; (C) Selling SAR Holder's conviction or plea of nolo contendere of any felony or of any crime involving moral turpitude or that could reflect in some material fashion unfavorably upon D&P Management and/or its Subsidiaries and Affiliates; (D) Selling SAR Holder's participation in any fraud or embezzlement against D&P Management and/or its Subsidiaries and Affiliates; (E) material breach by Selling SAR Holder of any of his fiduciary duties to D&P Management and/or its Subsidiaries and Affiliates (in each case other than as a result of Disability) which shall not be cured within thirty (30) days following notice to Selling SAR Holder, which such notice shall specify in reasonable detail the acts or omissions constituting such breach; (F) the entering of a final, non-appealable order due to any an act or omission of Selling SAR Holder by a Governmental Body having jurisdiction over D&P Management and/or its Subsidiaries and Affiliates which has the effect of making Selling SAR Holder unable to perform any material duties required to be performed by him as an officer of D&P Management and/or its Subsidiaries and Affiliates, as the case may be, or (G) any act or omission by Selling SAR Holder that causes D&P Management and/or its Subsidiaries and Affiliates to lose or not be able to obtain any material license or registration necessary for D&P Management and/or its Subsidiaries and Affiliates to operate its business; provided that no

3

termination of the provision of services that is carried out at the request of a Person seeking to accomplish a change in control or otherwise in anticipation of a change in control shall be deemed to be for "Cause."

(ii)     "Competing Business" means any business that offers consulting or investment banking services in the United States in any of the following areas: (A) restructuring consulting or advisory services; (B) corporate finance or capital raising services; (C) financial reporting and tax valuation; (D) fixed asset and real estate consulting; (E) M&A advisory, fairness and solvency opinions; (F) ESOP and ERISA advisory services; (G) legal business solutions and (H) dispute consulting; provided that (i) if Selling SAR Holder is employed or involved in the money management industry (i.e., private equity investing, leveraged buyout investing, mezzanine investing or distressed investing) other than by providing consulting or related services with respect to restructurings, he shall not be deemed to be involved in a "Competing Business" and (ii) nothing herein will prevent the Selling SAR Holder from being employed by or otherwise associated with any business or entity that engages in any Competing Business, so long as the Selling SAR Holder is in no way directly or indirectly involved in the Competing Business of such business or entity; and

(iii)    "Disability" or "Disabled" means a good faith determination by the board of directors (or comparable body) of D&P Management that Selling SAR Holder is unable to perform Selling SAR Holder's job responsibilities in all material respects as a result of a physical or mental illness, injury or condition for a period of six months or more during any twelve month period.

(iv)    "Good Reason" means resignation within three (3) months of any of the following events: (A) Selling SAR Holder is required to relocate to an office more than twenty (20) miles from the Company office occupied by Selling SAR Holder as of the date hereof (it being understood that frequent business travel shall not constitute Good Reason) without the prior written consent of Selling SAR Holder; (B) Selling SAR Holder's base salary is reduced below $175,000 per year (or such higher amount constituting Selling SAR Holder's base salary after taking into account any applicable promotion(s) after the date hereof); (C) Selling SAR Holder is: (x) no longer a Managing Director or such comparable position as may now or hereafter exist with respect to the Acquiror and its Subsidiaries (or such other position occupied by Selling SAR Holder after taking into account any applicable promotion(s) after the date hereof); or (y) assigned duties inconsistent with such position; (D) D&P Management, its Subsidiaries and Affiliates, as a consolidated group, exit the Restructuring Business or publicly announce their intent to do so; or (E) a material breach by D&P Management and/or its Subsidiaries and Affiliates of any

4

written employment agreement with Selling SAR Holder which shall not be cured within thirty (30) days following notice to D&P Management, which such notice shall specify in reasonable detail the acts or omissions constituting such breach.

(c)     During the Term, or the Extended Term, as applicable, Selling SAR Holder will not directly or indirectly (i) solicit, induce or attempt to induce any employee or independent contractor known by Selling SAR Holder to be employed at the time by any Related Company to leave the employ or contracting relationship with such entity (other than by means of general solicitations not directed at such persons), or (ii) solicit, induce or attempt to induce any employee known by Selling SAR Holder to be employed at the time by any Related Company to remain in or return to the employ of Selling SAR Holder or any of his Affiliates or otherwise attempt to retain or obtain the services of any such person (other than by means of general solicitations not directed at such persons), or (iii) solicit, induce or attempt to induce any customer or other business relation of any Related Company as of the date hereof to cease or reduce doing business with such entity; provided that if Selling SAR Holder is terminated by Acquiror or any of its Affiliates without Cause or Selling SAR Holder resigns with Good Reason and does not provide Acquiror with a Notice of Extension, Selling SAR Holder's obligations with respect to clause (iii) shall terminate on the date of such termination without Cause or resignation with Good Reason.

3.     Enforcement. The Company and Selling SAR Holder agree that if, at the time of enforcement of Section 1 or 2, a court holds that any covenant set forth in any such Section is unreasonable under circumstances then existing, then the maximum period, scope or geographical area reasonable under such circumstances will be substituted for the stated period, scope or area. Selling SAR Holder agrees that irreparable harm would occur in the event that any of the agreements and provisions of this Agreement were not performed fully by Selling SAR Holder in accordance with their specific terms or conditions or were otherwise breached, and that money damages would be an inadequate remedy for any breach of Section 1 or 2 because of the difficulty of ascertaining and quantifying the amount of damage that will be suffered by the Acquiror and its Subsidiaries in the event that this Agreement is not performed in accordance with its terms or conditions or is otherwise breached. Therefore, in the event of a breach of Section 1 or 2, Acquiror, any of its Subsidiaries or any of their respective successors or assigns (each a "Beneficiary") may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, the provisions of Section 1 or 2 and to enforce specifically such terms and provisions of this Agreement, such remedies being in addition to and not in lieu of, any other rights and remedies to which the Beneficiaries are entitled to at law or in equity. The provisions of Sections 1, 2 and 3 are intended to be for the benefit of each Beneficiary, each of which may enforce such provisions and each of which (other than Acquiror) is an express third-party beneficiary of such provisions and this Agreement generally.

K&E 11415317.1

4.    Waivers and Amendments.  The respective rights and obligations of Acquiror and Selling SAR Holder under this Agreement may be waived (either generally or in a particular instance, either retroactively or prospectively, and either for a specified period of time or indefinitely) or amended only with the written consent of a duly authorized representative of each of Acquiror and Selling SAR Holder.

5.    Successors and Assigns.  The provisions hereof shall inure to the benefit of the Beneficiaries, including their respective successors and assigns.

6.    Entire Agreement.  This Agreement constitutes the full and entire understanding and agreement of the parties with regard to the subject matter hereof and supersedes in their entirety all other or prior agreements, whether oral or written, with respect thereto.

7.    Notices.  All demands, notices, requests, consents and other communications required or permitted under this Agreement shall be in writing and shall be personally delivered or sent by facsimile machine (with a confirmation copy sent by one of the other methods authorized in this Section), reputable commercial overnight delivery service (including Federal Express and U.S. Postal Service overnight delivery service) or, deposited with the U.S. Postal Service mailed first class, registered or certified mail, postage prepaid, as set forth below:

If to Acquiror, addressed to:

Duff & Phelps Acquisitions, LLC
909 3rd Avenue, 12th Floor
New York, NY  10022
Attention: Management Committee and General Counsel
Facsimile: (212) 450-2801

with copies to (which shall not constitute notice to the Acquiror):

Vestar Capital Partners IV, L.P. / Duff & Phelps, Inc.
c/o Vestar Capital Partners
245 Park Avenue
41st Floor
New York, NY 10167
Attention: John R. Woodard and General Counsel
Facsimile: (212) 808-4922

and

Lovell Minnick Financial Advisory Holdings LLC
c/o Lovell Minnick Partners LLC
550 Deep Valley Drive
Suite 293
Rolling Hills Estates, CA 90274

6

K&E 11415317.1

Attention: General Counsel
Facsimile: (310) 265-1920

and

Kirkland & Ellis LLP
Citigroup Center
153 E. 53rd Street
New York, NY 10022
Attention: Michael Movsovich, Esq.
Facsimile: (212) 446-4900

If to Selling SAR Holder, addressed to:

Peter R. Corbell
c/o Chanin Capital Partners
11150 Santa Monica Blvd., 6th Floor
Los Angeles, CA 90025
Facsimile: (310) 445-4028

with a copy to (which shall not constitute notice to Selling SAR Holder):

Proskauer Rose LLP
2049 Century Park East, 32nd Floor
Los Angeles, CA 90067-3206
Attention: Michael Woronoff, Esq.
Facsimile: (310) 557-2193

Notices shall be deemed given upon the earlier to occur of (i) receipt by the party to whom such notice is directed; (ii) if sent by facsimile machine, on the day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) such notice is sent if sent (as evidenced by the facsimile confirmed receipt) prior to 5:00 p.m. Eastern Time and, if sent after 5:00 p.m. Eastern Time, on the day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) after which such notice is sent; (iii) on the first business day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) following the day the same is deposited with the commercial courier if sent by commercial overnight delivery service; or (iv) the fifth day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) following deposit thereof with the U.S. Postal Service as aforesaid. Each party, by notice duly given in accordance therewith may specify a different address for the giving of any notice hereunder.

8.   Governing Law. This Agreement shall be construed and enforced in accordance with and governed by the laws of the State of New York (without giving effect to any conflicts or choice of laws provisions thereof that would cause the application of the domestic substantive laws of any other jurisdiction).

7

9.    Consent to Jurisdiction

(a)    EACH OF THE PARTIES HERETO HEREBY CONSENTS TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN NEW YORK, NEW YORK OR LOS ANGELES, CALIFORNIA, AS WELL AS TO THE JURISDICTION OF ALL COURTS TO WHICH AN APPEAL MAY BE TAKEN FROM SUCH COURTS, FOR THE PURPOSE OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.  EACH PARTY HEREBY EXPRESSLY WAIVES ANY AND ALL RIGHTS TO BRING ANY SUIT, ACTION OR OTHER PROCEEDING IN OR BEFORE ANY COURT OR TRIBUNAL OTHER THAN THE COURTS DESCRIBED ABOVE AND COVENANTS THAT IT SHALL NOT SEEK IN ANY MANNER TO RESOLVE ANY DISPUTE OTHER THAN AS SET FORTH IN THIS SECTION, OR TO CHALLENGE OR SET ASIDE ANY DECISION, AWARD OR JUDGMENT OBTAINED IN ACCORDANCE WITH THE PROVISIONS HEREOF.

(b)    EACH OF THE PARTIES HERETO HEREBY EXPRESSLY WAIVES ANY AND ALL OBJECTIONS IT MAY HAVE TO VENUE, INCLUDING, WITHOUT LIMITATION, THE INCONVENIENCE OF SUCH FORUM, IN ANY OF SUCH COURTS.  IN ADDITION, EACH OF THE PARTIES CONSENTS TO THE SERVICE OF PROCESS BY PERSONAL SERVICE OR ANY MANNER IN WHICH NOTICES MAY BE DELIVERED HEREUNDER IN ACCORDANCE WITH SECTION 7 OF THIS AGREEMENT.

10.    Waiver of Jury Trial.  EACH OF THE PARTIES HERETO HEREBY VOLUNTARILY AND IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING BROUGHT IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

11.    Severability; Titles and Subtitles; Gender; Singular and Plural; Counterparts; Facsimile.

(a)    Without limiting Section 3, in case any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

(b)    The titles of the sections and subsections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

(c)    The use of any gender in this Agreement shall be deemed to include the other genders, and the use of the singular in this Agreement shall be deemed to include the plural (and vice versa), wherever appropriate.

8

(d)     This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together constitute one instrument.

(e)     Counterparts of this Agreement (or applicable signature pages hereof) that are manually signed and delivered by facsimile transmission shall be deemed to constitute signed original counterparts hereof and shall bind the parties signing and delivering in such manner.

**[The remainder of this page is intentionally left blank.]**

9

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first above written.

DUFF & PHELPS ACQUISITIONS, LLC

By: _____

Name: Noah Gottdiener

Title: Chief Executive Officer

Peter R. Corbell